## ESTATE OF JESSE STEWART, DECEASED.

APPEAL BY J. F. CONNOLLY ET AL. FROM THE ORPHANS' COURT
OF LACKAWANNA COUNTY.

Argued February 24, 1890—Decided October 13, 1890.
[To be reported.]

1. Though an executor, in filing an inventory of his testator's estate, has included therein, as part of the estate, a judgment standing in the testator's name, he is not estopped by the filing of such inventory from afterward claiming to own said judgment, by virtue of an assignment of it to himself.

2. Such inventory, however, is evidence from which, in connection with prior and subsequent acts and declarations of the executor, recognizing the judgment as belonging to the estate, it may be inferred that the assignment, shown to have been made without consideration, was not intended to operate as a gift.

3. Where, at the date of a transfer of a judgment, alleged to be a gift from a father to a son, confidential relations existed between them, and the father was then of great age and infirm health, it should clearly appear that a gift was intended by him, and that it was his voluntary and intelligent act.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and Mc-COLLUM, JJ.

No. 372 January Term 1889, Sup. Ct.; court below, number and term not given.

On June 30, 1884, Dr. Thomas Stewart, executor of the will of Jesse Stewart, deceased, filed his first account, which afterwards passed in due course to final confirmation. On January 14, and June 20, 1885, petitions were presented by distributees interested in the estate, praying for a review of the account. A citation having issued to the accountant, and answer thereto filed, the court made an order opening the decree of confirmation, and referring the account to *Mr. J. Alton Davis*, as auditor.

Among the credits claimed in the account as filed, and objected to by the exceptants before the auditor, was one stated in the following words : " By assignment of judgment, $5,000." The following facts relating to that credit were shown :

On May 1, 1877, Jesse Stewart, the testator, who was the father of the accountant, sent to Judge Handley, of Scranton, the sum of $9,276.49, for investment. Of this sum, Judge Handley invested $5,000 in a bond and mortgage given by one Melvin to Annie C. Loag, taking an assignment thereof from Annie Loag to Jesse Stewart; $3,500 in a judgment against John Gibson, and the remainder, $776.49, in notes of one Beardsley. In October, 1877, Jesse Stewart wishing to have $1,400, that amount was sent to him by Judge Handley, who took from him an assignment of the Gibson judgment to that extent. This reduced the interest of the testator in these investments to $7,876.49, upon which amount interest was regularly remitted to him by Judge Handley until July 1, 1881. Prior to the latter date, however, the securities had been changed by Jesse Stewart's direction. Certain notes discounted in bank, given by the accountant and indorsed by the testator and Judge Handley, having been dishonored, were paid by Judge Handley and charged to the Jesse Stewart fund. These payments used up the Gibson judgment and the Beardsley notes, and in addition thereto the sum of $1,780.96 of the Loag mortgage. On March 25, 1880, that mortgage was assigned by the testator, to the extent of $3,000, to John Rudy, as collateral security for a loan made by him to the accountant. The loan and security were afterwards transferred by Rudy to R. Crippen, and were paid to Crippen, after the testator's death, by Judge Handley, and charged against the testator's funds. Thus, all the funds invested by Judge Handley for the testator were used up, except a balance of $219.04. This balance, after the testator's death, was paid in cash to the accountant by Judge Handley.

Jesse Stewart, the testator, lived at Belvidere, New Jersey.

The accountant lived at Scranton. On June 18, 1881, the testator, then about eighty-eight years of age and in feeble health, came to Scranton in response to a telegram from his son, the accountant, and remained there for several days. On the day of his arrival, he received from the accountant a judgment note for $4,000, as security for his past indorsements for the latter. The testimony before the auditor tended to show that, two days later, he made an assignment to the accountant of the debt secured by the Loag mortgage and the judgment

bond accompanying the same. In view of the use that had been made of the funds invested in that mortgage, to take up and secure debts of the accountant, the effect of such assignment, if absolute, would practically be a release of the accountant from debts due by him to his father.

On November 25, 1881, the testator died at Belvidere, N. J., leaving a will whereby he appointed his two sons, Jesse and Thomas, as his executors. His will was duly proved in Warren county, N. J., on December 23, 1881. On the same day letters testamentary were granted to the executors therein named, who filed an inventory and appraisement of the estate, containing the following item: "Amount of money received by the Hon. John Handley and Thos. Stewart, M. D., agents of Jesse Stewart, Sr., $9,276.49." On June 27, 1883, ancillary letters were granted to the accountant by the register of wills of Lackawanna county, his co-executor, Jesse Stewart, Jr., declining to act in Pennsylvania; and on June 30, 1883, the accountant filed an inventory with said register, the second item therein being stated thus: "Mortgage and judgment notes amounting to $12,000, upon which there is due thereon the sum of $7,876.49 with interest on the same from the 10th day of July, 1881; total value, $8,805.91."

In the account in question before the auditor, the accountant had charged himself with the whole amount of the Pennsylvania inventory. The principal sum of $7,876.49, mentioned in the item of said inventory above quoted, included the Loag mortgage; and the credit in the account of $5,000 which was excepted to, was taken in pursuance of a claim that the debt secured by said mortgage had been given to the accountant by the assignment in June, 1881, above mentioned.

The auditor, in his first report, surcharged the accountant with $5,000, holding that, by putting into the inventory the amount of the Loag mortgage, he was estopped from claiming title thereto. Exceptions to this ruling were sustained by the court, ARCHBALD, P. J., citing Bell's Est., 25 Pa. 92, and distinguishing Miller v. Springer, 70 Pa. 269; s. c. 88 Pa. 203; and the report was re-committed to the auditor for a finding upon the question whether or not the alleged assignment was in fact made. In his second report, the auditor found adverse-

ly to the accountant upon this question, and accordingly recommended that the surcharge of $5,000 be allowed to stand.

Upon exceptions to this report, the court, ARCHBALD, P. J., overruled the auditor's finding upon the question respecting the making of the assignment, but declined to give effect to the assignment as an absolute transfer, and confirmed the surcharge, for reasons stated in the opinion, which was, in part, as follows :

But the fact of the assignment, and the effect to be given to it, are two separate and distinct things. It is in this connection· that the facts and circumstances which are so forcibly arrayed by the auditor against the assignment come in, and show that an absolute and unqualified transfer of this judgment to the accountant to hold as his own, could not have been intended and cannot now be sustained.

In the first place, then, it is not pretended that the transfer was for value; it is simply claimed as a gift from the decedent to his son. Now, not only is the evidence of this unsatisfactory in itself, but the subsequent conduct of the accountant with respect ·to this security entirely dissipates such an idea. . . . .

But, going back to the evidence of Judge Handley, how did it come about, if he knew that the Loag mortgage had been given to Dr. Stewart, that on July 26, 1881, he paid to Jesse Stewart the interest on this security for the six months preceding ? Or, again, in August, 1882, after the death of the decedent, when Daniel LaBar and Jesse Stewart, Jr., came to Scranton for the express purpose of seeing how the estate stood, and in company with Dr. Stewart went to the office of Judge Handley, how was it that, in the detailed examination of books and accounts there gone into, no mention was made of the accountant holding an assignment of the Loag judgment? Or, still again, in June, 1883, when Dr. Stewart took the appraisers to the same office, to obtain from Judge Handley a statement of the affairs of the estate for the purpose of making an inventory and appraisement of it, why, if this same security was then, to the knowledge of the witness, owned by the accountant, was it given to the appraisers as part of the estate ? I can find no satisfactory answers to these questions anywhere in the

case; and while it is true that the accountant is not answerable for what Judge Handley did or did not do, I agree with the auditor that these acts may well be weighed against his testimony as a witness, and that the latter is to such extent discredited. I do not mean in this to suggest anything derogatory to Judge Handley. The circumstances simply show that he must be mistaken.

This conclusion is emphasized when we come to consider the conduct of Dr. Stewart himself, with respect to this security. On a trip to Belvidere in December, 1881, about a month after the death of his father, he stated to Daniel LaBar, who was there to become surety for him as executor of the estate, that the property at Scranton amounted to nine thousand two hundred and odd dollars, besides some bank stock. It was at this time that the appraisement in New Jersey was made, and included therein, in funds, the following item: "Amount of money received by the Hon. John Handley and Thos. Stewart, M. D., agents of Jesse Stewart, Sr., $9,276.49." The inventory containing this was signed by Dr. Stewart, and proved before the surrogate by his oath, with that of the other executor and one of the appraisers. The amount so given necessarily included the $5,000 Loag judgment, and we have thus a solemn admission confirmed by the oath of the accountant, that it constituted a part of the decedent's estate.

We have already noted that Dr. Stewart was present at Judge Handley's in August, 1882, when Daniel LaBar and Jesse Stewart, Jr., went over in detail the affairs of the estate, and that no claim was then made to this judgment. We also have a reference to the same investigations in a somewhat remarkable letter from Dr. Stewart to his co-executor, in November, 1882:

"SCRANTON, Nov. 14, 1882.

"MR. JESSE STEWART, Stewartsville.

"Dear Sir: . . . . . You ask me in your letter if you shall advertise for settlement. What can I say? I do not know. I have been manipulating one way, and you have been manipulating another way. I told you the truth on two different occasions; then you came up here to see for yourself, and I supposed that you were satisfied, after seeing things in black and white, that what I told you was so. You seemed at that time to

be satisfied that all was right, and in the last letter you wrote to me if Judge Handley would not furnish the money and take a mortgage on my property; something must be wrong, as though him and me was a conspiring together to defraud and cheat the estate. Then you write to Judge Handley to know if I would be willing to give a mortgage if you could raise the money down there, and he wrote to you that I would be glad to give a mortgage for five thousand dollars to settle the matter, as I was tired of this slander all the time about cheating the estate; and so I am, for it has been thought Judge Handley and myself was going to cheat father and the estate out of the money ever since it came here, and there has been more fuss made over these eight or nine thousand dollars than many persons would have made over two hundred thousand dollars. Now what can I say? I do not know whether you can get the amount of five thousand dollars or not; if you can, I am ready to send you bond and mortgage to that effect at a reasonable rate of interest, payable annually, which Judge Handley wrote to you about. . . . .

" Yours respectfully,

"THOMAS STEWART."

It seems to me that there is enough in this letter alone to discredit the present claim. At the time it was written, the $3,000 for which the Loag mortgage was pledged as collateral had not yet been paid. The indebtedness of the accountant to the estate therefore was summed up in the $4,657.46 paid upon his notes, out of the funds of the decedent, with interest which would run it up to the neighborhood of $5,000. It is this that the mortgage of that amount referred to in the letter was no doubt intended to cover. Nothing indeed is directly said about the Loag mortgage, but the writer asserts the truth of his former statements to his co-executor, and appeals to the personal investigation made by the latter in proof of them; speaks of the eight or nine thousand dollars over which so much fuss has been made, and finally refers to the mortgages of his father, held by Judge Handley against the property shown the executor when he was up in Scranton, upon which security and such as he could furnish personally, he thinks Judge Handley would be safe in paying over the money of the

estate. Now the only moneys at the time which practically were in Judge Handley's hands, were the balance not yet exhausted by the debts of Dr. Stewart, of the $5,000 Loag mortgage. For, of the $9,276.49 originally received, and invested in the Gibson judgment of $3,500, the Loag mortgage of $5,000 and the Beardsley loan of $776.49, fourteen hundred dollars had been repaid to the decedent October 1, 1877, and $4,657.45 had been paid out from time to time on Dr. Stewart's notes. . . . The face of the Loag mortgage had thus at that time been drawn upon to the extent of some $1,800 on account of this accountant's debts. The balance of $3,200, according to his present claim, belonged to him by virtue of his assignment, and yet he talks in this letter of Judge Handley turning over the estate to his co-executor! . . . . .

No doubt the inventory made by an administrator or executor, is not conclusive upon him. The law imposes the duty of making a true and perfect inventory of the estate, which he must submit to appraisers to value. But it would be a harsh rule to hold him concluded thereby, and such is not the law. The inventory is prima facie evidence of the extent and value of the estate which has come to the administrator's hands, but he may still show that through inadvertence, ignorance, or mistake, property has been put into it which did not in fact belong there : King's Est., 12 W. N. 109; Bradford's Case, 1 Bro. 87 ; 3 Williams on Exrs., 1966 n. This may well apply not only where property has been inventoried which is found to belong to a third party, but also where by mistake or inadvertence the administrator has inventoried that which belongs to himself. Of necessity, however, in the latter case a much more stringent rule of proof must be observed than in the former. It is so extraordinary a suggestion for the administrator to lay claim as his own to that which apparently he has voluntarily inventoried as part of the estate, that he can only be allowed to prevail in such claims upon the clearest and most satisfactory evidence. What explanation, then, is offered by the accountant here for inventorying this security ?

It is suggested, though how this comes into the case I hardly know, only that it appears in the auditor's report and was adverted to by counsel at the argument, that upon the inventory in New Jersey everything was put in, including even the ad-

vancements to the heirs, so as to swell the estate and enlarge the commissions of the executors.  If there were indeed anything sufficiently definite in the case to bear this out, I should be compelled to discard it, upon the principle, nemo allegans suam turpitudinem audiendus est.  But there is not.  Dr. Stewart indeed testifies that they included the advancements under his protest, but nothing was said against the amount at which the property in his and Judge Handley's hands was stated.  Now, is there anything to sustain the further suggestion that the inventory here was based upon that in New Jersey?  The evidence is to the contrary.  The inventory and appraisement here were independently made from an examination of the securities submitted.  It is true, Judge Handley says that he included the Loag mortgage at the time, so that the whole transaction with the decedent might appear, and the inventory here correspond with the amount given to LaBar and the other executor.  But we are not concerned with the purpose of Judge Handley.  The accountant says that he furnished the information to the appraisers, and Judge Handley merely gave them the items; and, in any event, it is evident that the statements made and securities exhibited to the appraisers were accepted and adopted at the time, as correctly representing the affairs of the estate.

What mistake or inadvertence can be predicated upon such evidence?  There is no allegation by Dr. Stewart that the assignment escaped his mind, or that he did not understand the effect of the inventory.  No subsequent effort is made to have it corrected so as to truly represent the estate according to the present claim: Bradford's Case, 1 Bro. 87.  Not a thing is heard of it by any one interested in the estate, until it is set up in the account now under consideration.  The whole of the accountant's case lies in his possession of the assignment and the evidence which goes to show that it was a gift.  Against the inventory alone this might be sufficient; but the fact of having inventoried this security as belonging to the estate is by no means the whole of the case against him.  All the facts and circumstances, which I have endeavored to detail, extending from a time immediately subsequent to the decedent's death up to within a few months of filing his account, rise up with accumulated force and confront the accountant in his

Opinion of Court below.

present claim. What should be the effect upon the candid mind? Should the assignment of the judgment and the assertion that it was a gift be allowed to prevail, or the acts and admissions of the accountant, which entirely refute such an idea? It seems to me that there can be but one answer to this, and whatever may have been the purpose of making the assignment, we are forced to conclude from the evidence that it was never intended by the decedent or understood by the accountant to be a gift, or that he thereby became the owner in fact of the security. . . . . .

But there is still another matter touching this claim, only slightly adverted to by the auditor, which to my mind, is conclusive against it; so that if all which has been so far considered were insufficient to overcome the effect of the assignment, it could not, nevertheless, be allowed to prevail. The accountant stood in such confidential relations to his father, that public policy will not, under the circumstances presented in this case, allow him to profit by the alleged gift. The decedent in June, 1881, was in his eighty-eighth year. He had been in feeble health for some time previous, and upon being called to Scranton by Dr. Stewart's telegram, it was not considered prudent for him to go without the company of his granddaughter. If the opinion of Dr. McGee, his attending physician, be taken, he was childish and in his dotage, and not capable of transacting important business. These are circumstances of some, but not necessarily of a controlling importance. Undue influence may exist between persons in full health of body and strength of mind; it is only that the weakness of either tends to create a greater feeling of dependence, and is the more liable to imposition, and improvident impulses. But the prime inquiry in such cases always is as to whether a relation of confidence between the donor and the donee existed at the time of the alleged gift. If it did, then the latter shall take nothing by the gift without satisfactory evidence that it was the clear intent of the donor to confer the benefit obtained, after having been fully advised with respect to the same, either by the donee himself or by some other and indifferent party. This rule is too well established and too familiarly known to need the citation of authority to sustain it. It will be found fully exemplified, however, in Huguenin v. Baseley, 14 Ves. 294; Bellage

v. Southee, 9 Hare 540; Rhodes v. Bates, L. R. 1 Ch. App. 252; Greenfield's Est., 14 Pa. 505; Boyd v. Boyd, 66 Pa. 283; Darlington's App., 86 Pa. 512; Cuthbertson's App., 97 Pa. 163; Miskey's App., 107 Pa. 611; Brogan's App., 2 C. P. Rep. 148; Yardley v. Cuthbertson, 108 Pa. 395; 2 Lead. Cas. in Eq., p. 1192, et seq.

To my mind the present case falls within the rule. Less than what is here shown was held sufficient by the Supreme Court in Brogan's Appeal, supra, to set aside the voluntary deed from a mother to a daughter. There were peculiar relations of confidence between the decedent and his son with respect to the subject of the alleged gift. It composed or was supposed to compose a part of property of the decedent which had been entrusted to Dr. Stewart and Judge Handley for investment and management. The former had indeed been allowed to draw upon it, from time to time, to meet his personal financial needs. Still, there had been an apparent intent on the part of the decedent to meet this by taking counter security, and the moneys as originally invested in the Gibson judgment and Loag mortgage were held and regarded as substantially intact. Interest was regularly paid upon them to the decedent every six months. They had in fact, however, been almost entirely eaten up by the accountant's debts; $4,657.45 had been actually paid out for Dr. Stewart at that time, and $3,000 more was pledged to secure his note to Mr. Rudy. Practically the whole estate was gone. Was this condition of things known to the decedent, or brought home to him, at the time of making this alleged gift? There is certainly nothing to show it. On the contrary; it is said that, while angry with one of his other children, Mrs. Wilson, for having had to pay some $1,400 for her, several years before that, he considered his son Thomas as the only one who had ever done anything for him, and this combined reason is assigned as the motive for the gift. If this was what actually moved the decedent, it shows, not only the unreasoning impulse of a childish old man, but,—what is more important upon the point we are now considering,—an entire misapprehension also of the facts. What information or counsel, then, did the decedent receive at this time? It is certain the accountant offered none, and it is doubtful whether Mr. Campbell was in a position or had the knowledge to afford any. True, Judge

Arguments.

Handley says he advised against the suggestion made by the decedent that he was going to give all his property here to his son, Dr. Stewart. But what facts or information did he lay before him, which might be expected to dissuade a rational mind?

Again; it is pertinent to inquire whether the decedent was advised as to the legal effect of the transfer of this security to the accountant. Did he suppose that the assignment simply bestowed the balance of the Loag mortgage over and above the $3,000 for which it stood pledged, or did he expect and intend, as now claimed by counsel, in the ninth exception, that it also canceled the obligation of the accountant to which it was collateral? In the one case it amounts to two and in the other to eight thousand dollars. It is incumbent upon the claimant to clear up these matters in order to relieve the transaction from the imputation of undue influence, which the law otherwise conclusively presumes. This has not been done. Upon grounds of public utility, then, as well as for the other reasons before stated, the alleged gift to the accountant cannot be allowed to prevail. . . . . The result is that notwithstanding the second and third exceptions on the part of the accountant, have been sustained; [the supplemental report of the auditor, and the re-statement of account therein contained, must be confirmed, and it is so ordered.] [2] [And it is further ordered that the costs of audit, amounting to the sum of $321, be paid by the accountant, out of the funds of the estate in his hands, to be reimbursed, however, unto the said estate by the said accountant, out of his own personal funds.] [3]

—Thereupon, Dr. Thomas Stewart, the accountant, having died pending the proceedings, John. F. Connolly and others, his executors, who were substituted, took this appeal, specifying for error:

2, 3. The orders of the court below embraced in [ ] [2] [3]

*Mr. W. H. Jessup* (with him *Mr. Jessup, Mr. Hand* and *Mr. M. W. Lowry*), for the appellants.

Counsel, confining the argument chiefly to the facts in controversy, cited and distinguished: Miskey's App., 107 Pa. 611; Cuthbertson's App., 97 Pa. 163.

*Mr. Charles H. Welles*, for the appellees.

Counsel cited: Houghton v. Houghton, 15 Beav. 278; Miskey's App., 107 Pa. 611; Brogan's App., 2 C. P. Rep. 148; Warrall's App., 110 Pa. 349; Shea's App., 121 Pa. 302; Miller v. Springer, 70 Pa. 269; s. c. 88 Pa. 203.

OPINION, MR. JUSTICE MCCOLLUM:

The learned auditor and the learned judge agreed that the judgment secured by the Loag mortgage belonged to the estate of Jesse Stewart. They were in accord as to the ownership of it, but differed in their methods of reaching the same conclusion. The former was of opinion that the assignment of it was spurious, while the latter thought it was genuine, that it had served its purpose, and that the title which passed by it had reverted to the assignor. We think the learned judge was right in his conclusion that the instrument purporting to be an assignment of the judgment was executed by the decedent on the day it bears date.

It is not pretended that there was a valuable consideration for the assignment; it is claimed that it was a gift of the judgment and the mortgage which secured it. The evidence of the alleged gift consists of the written transfer and what was said by the decedent concerning it, at or near the time of its execution. James H. Campbell was the only witness who testified to any declaration of the decedent indicating a purpose to make the gift. It must be conceded that the testimony fails to furnish a satisfactory explanation of the transactions between the father and son, on the occasion of the visit of the former to the latter, in June, 1881. This visit was made in compliance with the son's telegram to come to Scranton immediately. On his arrival there, in the afternoon of the 18th of June, he received his son's judgment note for $4,000 to secure him for past indorsements, and two days later he executed the assignment which is the subject of this litigation. It is a fair inference from the evidence before us that these transactions were suggested by the son, and that he had them in contemplation when he summoned his father to Scranton. It was a business visit prompted by him, and these were its fruits. In view of the relations existing between the alleged donor and donee respecting the former's property in Pennsylvania, and his great age

and infirmity, it ought to clearly appear that a gift was intended by him, and that it was his voluntary and intelligent act.

In passing upon the only question in the case, to wit, whether there was an absolute gift of the judgment by the father to the son, we must consider the conduct of the latter, as well as the acts and declarations of the former.   The assignor of the judgment died in November, 1881, and, in December following, the assignee thereof, as his executor, filed an inventory in the proper office at Belvidere, N. J., which included the judgment among the assets of the estate.   In the ancillary administration in Pennsylvania, nearly two years after the death of the assignor, it was again placed in the inventory of his effects. ' This action of the assignee of the judgment cannot be reconciled with the theory that the assignment was a gift of it to him.   It is consistent, however, with an understanding between the parties that the assignee should hold the judgment in trust for the assignor, and thus relieve the latter of any care attending the control and collection of it.   The existence of such an understanding is entirely compatible with what the decedent said to Judge Handley concerning the assignment, and the only evidence in the case directly opposed to it is that of Campbell.

The inclusion of the judgment in the inventories mentioned was a deliberate acknowledgment by the assignee that it belonged to the estate of the assignor.   It was not a mistake, and his attempt to make it appear as such finds sufficient condemnation in his letter to his co-executor, under date of November 14, 1882.   There are other acts and declarations of the assignee, extending over a period of nearly three years after the death of the assignor, which strongly negative the present claim of a gift, and are in harmony with the assertion of the inventories that the judgment in question is the property of the estate. These are grouped and commented upon in the opinion of the learned judge, and a detailed statement of them here is not deemed necessary.   We are of opinion, upon full consideration of all the evidence, that no error was committed by the Orphans' Court, in finding that the assignment was not a gift of the judgment.

> Decree affirmed, and appeal dismissed at the cost of the appellant.