## O'Leary's Estate.

*Wills—Bequest for maintenance—Charge upon residuary estate.*

1. Testator, after directing payment of his debts and funeral expenses and certain sums for masses, directed his wife, as executrix and residuary beneficiary, to maintain and support his brother. No limitation as to amount, time or place was set upon the bequest for the benefit of the brother, and it was expressly made a charge upon the gift to the wife: *Held*, that the bequest for maintenance of the brother was on a plane higher than the benefactions to the wife, and the entire estate, real and personal, that came into her hands, either as executrix or as residuary beneficiary, was charged primarily with payment of such sums as might be necessary for his support.

*Executors and administrators—Accounts—Attack by executrix upon her own inventory and appraisement—Burden of proof—Evidence—Requirements.*

2. An executrix who, after a period of five years, during which time she has filed no account of her administration, seeks to attack the inventory and appraisement filed by her, has the burden of proof. The presumption is strong, under such circumstances, that the figures of the inventory and appraisement are correct. The evidence to sustain the attack must be the clearest and most satisfactory.

*Jurisdiction, O. C.—Order to compel payment of bequest—Fiduciaries Act of 1917—When operative upon estate of one who died before June 7, 1917.*

3. If the Orphans' Court determines that the executrix and residuary beneficiary of a decedent's estate has received funds which are subject to a charge put upon them by the testator, without a proper accounting, the court can follow such funds whether they are still in the hands of the executrix in her fiduciary capacity or have passed into her personal estate as beneficiary. If the funds are still in the hands of the executrix, as such, she is subject to the control of the court under the provisions of section 9 of the Orphans' Court Act of 1917, P. L. 363. If the funds have passed into her individual estate, they may be controlled by the court under clause *b*, section 49, of the Fiduciaries Act of 1917, P. L. 447.

4. The Fiduciaries Act of 1917, P. L. 447, is operative to control the distribution of the funds of a decedent's estate, even though the date of death may have been prior to the date of the passage of the act, if the time for distribution of the estate was not ripe until after its passage.

5. The person for whose benefit a bequest for maintenance has been made having petitioned the Orphans' Court to make the necessary order upon the executrix to enforce payment, with reference only to the personal estate of the testator, the court will afford only the remedy sought, but if it should be made to appear subsequently that the personal estate was not adequate to the need, the petitioner may make further application to the court.

Petition for order to compel payment of bequest. O. C. Washington Co., Nov. T., 1921, No. 67.

*McIlvaine, Williams & McCreight*, for petitioner.

*Harry W. Cannon*, for respondent.

HUGHES, P. J., April 12, 1922.—The matter before us for adjudication is founded upon the petition of John O'Leary, asking for an order on Jennie S. O'Leary, executrix of the last will and testament of Gerald A. O'Leary, deceased, requiring her, as such executrix, to make payment of sufficient and proper sums for the petitioner's support and maintenance, in accordance with alleged provisions and requirements to that end contained in said will. The executrix opposes such application, and her answer to the said petition having been duly filed, followed by the petitioner's replication, the issue thus framed came on to be heard on testimony and argument. Following is a brief statement of the material facts found from the weight of the evidence:

Gerald A. O'Leary, the decedent, a resident of Monongahela City, Washington County, Pennsylvania, died on Aug. 16, 1916, survived by his widow, Jennie S. O'Leary, by an only child, Fred A. O'Leary (then aged about

O'Leary's Estate.

twenty-seven years), by a brother, John O'Leary, the petitioner, and by a sister, Nellie O'Leary. The decedent left a last will and testament, whereof he nominated his wife to be the sole executrix, and to whom, as such, upon the due probate thereof, letters were issued under date of Aug. 21, 1916. In due course of her administration the executrix caused to be made and filed in the Register's office an inventory and appraisement of the decedent's personal estate, the total whereof amounts to $70,677.40. The decedent died seized also of three certain parcels of real estate, all situate within the Commonwealth of Pennsylvania, to wit: A tract of land (less the underlying Pittsburgh coal vein, with the mining rights appurtenant thereto) in Fallowfield Township, Washington County, containing 93½ acres, more or less; a tract of land at Portview, Allegheny County, containing about 14 acres, and a bungalow property in Dormont, Allegheny County. The evidence indicates the aggregate value of these real properties to be upwards of $15,000.

At the time of his death, the said Gerald A. O'Leary owned, and for some years previously thereto had operated, a wholesale liquor business in the village of Axleton, Forward Township, Allegheny County, near the northern terminus of the bridge which crosses the Monongahela River at that point from Monongahela City, Washington County, such business being his main livelihood and chief means of support. In and by his last will and testament the decedent (after directing the payment of his debts and funeral expenses and also the sum of $500 for masses) directs his executrix to sell and dispose of his said wholesale liquor business, good-will, fixtures and stock, as soon after his death as the same can be done to advantage, suggesting that the same is worth $40,000, and should not, therefore, be sold for a less amount. The testator thereupon provides: "I hereby direct my wife hereinafter named to maintain and support my brother, John O'Leary, and to see that he is maintained outside all institutions. I further direct that my said wife shall pay for his support and maintenance out of her share of my estate." Then, after authorizing his executrix to sell the parcels of his real estate in her discretion, he gives, devises and bequeaths all the rest, residue and remainder of his estate, real, personal and mixed, absolutely and forever in fee simple, to his wife, Jennie S. O'Leary, whom he thereupon appoints to be the executrix of the said will.

John O'Leary, claiming the benefits of the said maintenance provisions in his favor, has instituted these proceedings to recover the same, averring in his petition, in institution thereof, that since the month of February, 1921, he has received from the said estate nothing whatsoever toward his support, and asking that an order be made requiring such executrix to pay him $50 per month for such purposes. In her answer to the citation granted under the said petition, the executrix admits the existence of such maintenance provisions in the said will, but avers that the same cannot be enforced because, at the time of the decedent's death, he was insolvent, his liabilities greatly exceeding his assets, so that, as the respondent avers, the decedent left nothing from which to pay the brother's support and maintenance; and further averring that she was forced to suspend making payments towards the petitioner's support in February, 1921, being then, thereafter and presently, financially unable to make further contributions to that end. The petitioner, taking issue on such defence, filed his replication, whereupon such issue was brought to trial on testimony and proofs.

The evidence shows that John O'Leary, the petitioner, is a bachelor, presently aged past seventy-one years, and wholly without means or property; his health having become impaired some twenty years since and completely

2 D. & C.

broken some ten years ago; since which last time he has been unable to work or even partially support himself. His physical afflictions have grown gradually worse during the past ten years, seriously impairing his locomotion and recently developing into serious and distressing bladder and bowel irregularities. His condition is now, and for some time has been, such that requires considerable personal attention, special washing and special meals served to him in his room; the petitioner having frequently recurring spells which for a considerable time thereafter render him wholly incapacitated. Since the complete breaking of his health some ten years ago, as has been said, his unmarried sister, Nellie O'Leary, has provided a home for him and contributed to his support; she being dependent on the wages of her labors for her own support, so that her contributions towards her brother's maintenance have been made at a considerable personal sacrifice. Following the death of Gerald A. O'Leary, an understanding was reached among his widow, his brother and his sister, whereby it was arranged that the estate of the decedent should thereafter contribute $35 per month toward the said invalid brother's support, which arrangement was thereupon carried out and payments made in accordance therewith, until the month of February, 1921, when, as has been said, all such payments were suspended and nothing thereafter paid to or for the petitioner, either by the said estate or by the decedent's widow individually. The question to be determined here is, should an order be entered requiring further payments to be made for such support, and, if so, in what amount?

Upon the death of Gerald A. O'Leary and the probate of his will, the respondent, as his widow, had the unrestricted choice of taking either under or against such will. Had she elected to take against the will, she would, of course, thereafter have been financially unconcerned with, and her share in the decedent's estate would have been entirely freed from, all liability for the support or maintenance of John O'Leary as directed in the said will. However, she elected to take under the will, and in so doing the shares therein prescribed for her were taken *cum onore*, to wit, charged with and liable for, *inter alia*, the support and maintenance of John O'Leary, in accordance with the provisions of the will: Kline's Appeal, 117 Pa. 139 (1887); Risk's Appeal, 110 Pa. 171 (1885), and Pittman's Estate, 182 Pa. 355 (1897). A widow's election, when made, must be wholly under or entirely under the will: Cunningham's Estate, 137 Pa. 621 (1890); Kline's Appeal, 117 Pa. 139 (1887). In the will before us the testator does not merely express a wish that his widow may afford support and maintenance to his brother, but he unconditionally orders that the brother be maintained and supported, burdening the entire residuary estate, real and personal, for the payment thereof and requiring the widow to pay such maintenance and support out of her share given her of such estate. It should thus be observed that, as between his brother and his wife, the testator's first consideration is for his invalid brother, for whose support he is more solicitous than of his wife's, whom, no doubt, he considered physically able, in any event, to procure a subsistence, especially in view of the generous share in his estate with which he deemed he was investing her by his will. Accordingly, such brother's rights in the estate are by the will made, and here must be considered to be, paramount to those given by the will to the widow. These maintenance provisions for the invalid brother's support are, therefore, entitled to first consideration and liquidation out of the assets of the estate left after the decedent's debts and the expenses of settling his estate have been paid therefrom, the personal estate, under the well-known rule, being primarily liable for the payment of

such maintenance, but the real estate being liable therefor as well; the payment thereof being, by implication of law, charged upon the decedent's land, the testator having blended all of such real estate with his personalty and then given the same to his wife as his residuary estate: Sloan's Appeal, 168 Pa. 422 (1895); Walters's Estate, 197 Pa. 555 (1901); Reel's Estate, 266 Pa. 221 (1920). And this real estate will remain so charged with and liable for the payment of such support, notwithstanding that originally there was ample personalty with which to provide for or pay such maintenance, but which personalty has since been lost through a *devastavit:* Cook v. Petty, 108 Pa. 138 (1884); or otherwise exhausted: Douty's Estate, 196 Pa. 432 (1900); the law contemplating that a bequest in the form of a provision for personal maintenance can be made a charge upon the land just as a pecuniary legacy may: Gibson's Appeal, 25 Pa. 191 (1855); Steele's Appeal, 47 Pa. 437 (1864); Fessenden's Estate, 170 Pa. 631 (1895); Walters's Estate, 197 Pa. 555 (1901); Wingett v. Bell, 14 Pa. Superior Ct. 558 (1900). Moreover, by her accepting the benefactions given her by the testator and so unconditionally charged with the burden of maintaining the testator's brother, she became personally liable for his support: Steele's Appeal, 47 Pa. 437 (1864; Etter v. Greenawalt, 98 Pa. 422 (1881); Fessenden's Estate, 170 Pa. 631 (1895); Walters's Estate, 197 Pa. 555 (1901); and in case of her selling any of the parcels of real estate so devised to her, even her alienee thereof, during the continuance of his estate therein, would likewise be personally liable for his support: Wingett v. Bell, 14 Pa. Superior Ct. 558 (1900).

Now, upon scrutinizing the will, it is observed that the provisions for the brother's maintenance are unconditional, unlimited and unrestricted; the testator making his estate liable for the entire cost and expense of maintaining and supporting his brother without any conditions or limitations as to amount, time or place. The brother's maintenance is, therefore, on a plane higher than that of the benefactions provided for his wife, and, consequently, are entitled to complete fulfillment, so long as there remain any assets whatsoever of the estate for such purposes, the *corpus* as well as the income being subject to be taken to pay the same: Johnston's Estate, 264 Pa. 71 (1919); even to the complete exhaustion of the entire assets of the estate: Phillips's Estate, 19 Pitts. L. J. (N. S.) 391 (1889).

In this proceeding the petitioner asks that the executrix be required to advance such funds for his maintenance and support, and, *prima facie,* he is entitled to recover; for, as we have seen, the testator, at the time of his death, presumptively left ample assets, both personal and real, available and sufficient for such maintenance purposes, to wit, personalty appraised in excess of $70,000, and realty of the estimated total value of $15,000. The widow, however, by the way of defence, attempts to overcome such presumption, maintaining that the decedent, at his death, was totally insolvent, and claiming that neither then nor since have there existed any estate assets by which to pay such maintenance, and that, accordingly, the said maintenance benefits, while admittedly authorized by the testator, are without substance to effectuate the same. Now, if indeed it be true that the estate was insolvent, as the respondent claims, the petitioner, of course, could not here recover; but the burden of proving such insolvency rests upon her shoulders, the said estate records before us raising a strong presumption to the contrary. Unfortunately, no administration account in this estate has ever been filed, the records showing no other administrative functions so far discharged than the probate of the will, the grant of letters testamentary and the filing of the inventory and appraisement. In support of her said defence, the widow, at

2 D. & C.

the hearing, offered evidence tending to show that the inventory contained many items of property listed therein which did not in fact belong to the decedent or his estate; furthermore, that the appraised values placed by the appraisers on many items of the personalty admittedly owned by the decedent were grossly excessive; and, furthermore, that the decedent, at the time of his death, owed debts in excess of the true value of his assets. Her attack on the inventory and appraisement was, in our opinion, but partially successful. The decedent having died before the passage of the Fiduciaries Act of June 7, 1917, P. L. 447, such inventory and appraisement were accordingly made and filed in compliance with the law in force at the time such functions were discharged, to wit, the Act of May 15, 1832, P. L. 135, section 15 whereof making it the duty of the personal representative of an estate to make a true and perfect inventory of all the goods, chattels and credits of the deceased and cause the same thereupon to be appraised, such inventory and appraisement to be filed in the Register's office within thirty days after the grant of letters. It, therefore, comes with very poor grace for the respondent now to claim that the many items of considerable value appearing in the inventory did not in fact so belong to the decedent, and, accordingly, should not have been therein included, when we remember that she, shortly after his death and in the performance of her official administration functions, put those very items therein herself. Of course, an inventory and appraisement is not conclusive, but is *prima facie* evidence of the extent and value of the estate and of the personal representative's liability therefor. However, a personal representative may show that, through inadvertence, ignorance or mistake, property has been therein erroneously included which does not in fact there belong: Stewart's Estate, 137 Pa. 175 (1890); and along such line the personal representative can go even so far as to establish that certain items listed as belonging to the deceased belonged in reality to such personal representative individually; but the law requires that such claims shall be supported by the clearest and most satisfactory evidence: Stewart's Estate, 137 Pa. 175 (1890).

In our opinion, the evidence submitted by the widow at the hearing in support of her own claims to the ownership of a large and valuable part of the personal property so listed in the inventory falls far short of the standard of proof required by the authorities; and as to such of those articles which she claims belong to her son, the evidence is likewise far from satisfactory, especially in view of the fact that such son, whom she alleges to be the owner thereof, himself acted as estate appraiser and, under his appraisal oath, set a value on such articles, thereby conceding that the same belonged to his deceased father's estate. Furthermore, upon considering her testimony as to these articles of personal property whose ownership she claims for herself or her son, the same is found to be little more than a mere averment of such adverse ownership, without any attempt to substantiate such assertions as to details of source, date or other circumstance. Moreover, under cross-examination, she, in many instances, contradicted the statements she had made under direct-examination, being furthermore contradicted in important matters by her son, who took the witness-stand in her behalf. In this connection, moreover, it must not be forgotten that such portion of her testimony as tended to support her own claims of ownership was adverse to the estate, and involving transactions had with her husband in his lifetime, should be given little consideration or weight, due objection to her competency as to such matters having been timely interposed. Her complaint that the adoption of the Federal Prohibition Amendment rendered the wholesale liquor business

and appurtenant good-will worthless, has little merit; for, as executrix, she had, for a long time before such prohibition measure got into full swing, ample opportunity to have closed out and disposed of such business to others. The evidence shows that she, however, did not embrace such continued opportunities, but saw fit to take over and herself operate the said liquor business, continuing the same until closed by the requirements of the War Prohibition Act, nearly three years after the decedent's death. The alleged loss sustained through the deaths of a considerable number of head of livestock falls into the same category; for, had she converted such livestock into cash, as due administration required, no such loss would have been sustained. Evidencing the inaccuracy, if not recklessness, of her statements in important matters, the discrepancy in her averments as to the real estate may be cited; it being observed that in paragraph 16 of the her answer she asserts that each of the parcels of the decedent's real estate was, at the time of his death, mortgaged to its full value, while on the witness-stand she admitted that as to each thereof there was, and is, a substantial equity.

The testator, as has been observed, valued, in his will, his liquor business at $40,000, and the same was appraised by the estate appraisers at a total valuation of $32,404. The evidence shows that, immediately after his death, the respondent, as has been said, had the liquor license transferred to her and thereafter continuously operated the same for nearly three years, such operations for the greater part of which period producing an admitted profit. The trial of this cause established that the estate, its administration and records, are now deplorably muddled; a condition caused, no doubt, by the respondent's wide and frequent digressions from the due and ordinary course of administration and rendering it well-nigh impossible for us here to arrive at any accurate and definite figures. The petitioner blames this existing confusion upon the persons who, she says, managed the liquor business after she had taken over the same; but, if such be true, the same may serve to excuse, to some extent, the inaccuracies in her testimony, but will not, of course, relieve her from her legal obligations to the petitioner.

The evidence shows that, at the time of the decedent's death, his unsecured indebtedness totaled something over $20,000, all of which has since been paid by the estate. From the weight of the evidence, we are of the opinion, and, hence, here conclude, that the liquor business, good-will, fixtures, teams and stock of merchandise, so taken over by her personally with the liquor license, were reasonably worth at that time at least the total of the said unsecured debts; and the one thus balancing the other, we are justified in considering, in our present deliberations and adjudication, the residue of the personal estate and the realty to have been thereby absolved of, and discharged from, accountability for such unsecured indebtedness. Without going further into the details of the controversies as to ownership and valuations of the items of property in inventory, some of which she so claims for herself and some for her son, it is sufficient for our present purposes to conclude from the weight of the evidence that the total net value of the personal property of the estate which remains, or should remain, in her hands as executrix and for which she, as such fiduciary, is accordingly accountable to the petitioner in her administration of the estate, is at least equal, and most likely two or three times exceeds, the total of the equities in the real estate which we have heretofore found to total somewhere between $5000 and $10,000. The evidence, therefore, has established to our satisfaction that the value of the net personal estate over and above all of the debts and expenses of administration was in itself, and independent of the real estate, far in excess of the amount
2 D. & C.

that would probably be needed for, or expended in due support and maintenance of, the petitioner throughout the balance of his life. And, in addition to this net personal estate, and equally liable with it for such support and maintenance, stands the decedent's real estate of the net equities indicated. Nor may the respondent set up as a defence to the petitioner's application that the assets of the personal estate, which reached her hands as executrix, have since been lost or exhausted; for the law will hold her accountable to him, not upon the present conditions of the estate or the assets, but upon the basis of the net valuation of the properties which came into her hands at the time of the testator's death, unaffected by the consequences of any subsequent losses or mismanagement.

On account of the respondent's frequent digressions and short cuts taken in the course of her administration, the exact present legal status of the personal estate is difficult to determine and define; it being remembered that five years have elapsed since she received the grant of letters testamentary, but no administration account has been filed, and, accordingly, no distribution has been decreed. However, in our opinion, it becomes immaterial whether the said net balance of the personal estate is considered to be still standing in her hands as executrix or as in her hands as an individual, as having been heretofore distributed to her individual self by herself as executrix, for the legal conclusion in either aspect would be the same. If, on the one hand, it be held that the said net personalty still remains in her hands as executrix, she, in such fiduciary capacity, is subject to the control and orders of this court under clauses *(a)*, *(d)*, *(e)* and *(l)* of section 9 of the Orphans' Court Act of June 7, 1917, P. L. 363. On the other hand, if it be held that she has heretofore distributed such net personal estate to her individual self (without having impounded any part thereof or made any other adequate provision for the preservation therein, and payment thereby, of the petitioner's maintenance rights), such distribution, having been made without the authority of this court, is accordingly to be held, under clause *(b)* of section 49 of the said Fiduciaries Act of June 7, 1917, P. L. 447, to have been effected unlawfully and at her own risk. It is to be remembered, in this connection, that in the matter of distribution, the respondent was amenable to, and obliged to follow, the distribution provisions of such statute; because, although her decedent died before its passage, yet, under the law at the time of his death in force, she had a full year in which to file her account (section 15 of the Act of May 15, 1832, P. L. 135); the creditors having no standing to compel her to make payment of their claims until the expiration of the year following the grant of letters: Section 22 of the Act of Feb. 24, 1834, P. L. 70. Accordingly, before the time for distribution became ripe, the said Fiduciaries Act of June 7, 1917, P. L. 447, had been enacted and became operative. It follows, therefore, that if it be considered that distribution of said net personal estate has thus been heretofore unlawfully made to her individual self, this court possesses plenary jurisdictional powers to compel and enforce correction and rectification of such unlawful distribution, wherein the rights of the petitioner have been wholly ignored.

Having thus reached the conclusion that the petitioner is entitled to recover and enjoy the maintenance authorized by the will, let us direct our attention to the remedies available to him. Apparently the law affords the petitioner three distinct remedies, to wit:

1. The pursuit of the widow individually, in order to compel her to pay such maintenance out of her own private funds and property, she, as has already been found, having become personally responsible for such main-

tenance by having accepted the benefactions prescribed for her in the will, whereon such maintenance was charged by the testator. In pursuing such remedy, however, the procedure would be by a proper proceeding in the Court of Common Pleas: Dinsmore v. Ramsay, 2 Dist. R. 657 (1893); unless the jurisdiction of that court has been taken away by the provisions of section 24 of the Fiduciaries Act of June 7, 1917, P. L. 447. As the petitioner has not seen fit to choose such remedy, and in the present cause is not proceeding along such line, no further discussion thereof is here necessary.

2. The pursuit of the personal estate, either on the theory that the same still stands in the hands of the respondent as executrix, or on the theory that the same has heretofore been distributed to her individual self unlawfully and at her own risk, and whereby the petitioner's rights therein have wholly been ignored. In such procedure this court has jurisdiction given by clause (l), section 9, of the Orphans' Court Act of June 7, 1917, P. L. 363, such jurisdiction being declared to be exclusive by section 24 of the Fiduciaries Act of June 7, 1917, P. L. 447, and compliance with any decree therein made being enforceable as prescribed by section 18 of the said Orphans' Court Act.

3. The pursuit of the real estate in the hands of the widow as charged with and liable for the payment of such maintenance provisions under section 25 of the Fiduciaries Act of June 7, 1917, P. L. 447, in which form of procedure the Orphans' Court has exclusive jurisdiction under section 24 of said statute. In the present proceeding the petitioner is not pursuing his redress against the real estate, and, hence, no further discussion here is necessary. In passing, however, it may be well to note that if, for any reason, the petitioner should, on account of lack of funds or other reason, obtain no proper financial results in the present proceeding against the personal estate, he has at hand, and available for his use, several parcels of real estate which, though encumbered, have apparently sufficient equities to provide for the petitioner's maintenance at a reasonable rate throughout his expectancy of life.

The petitioner here electing to look to the personal estate for his redress, it is the duty of this court, of course, to afford only the remedy sought. While the testator charged the brother's support on the widow and her share in his estate, she did not, by accepting such benefactions, become bound to afford the brother a home with her or to permit him to reside on any of the testator's real estate: Steele's Appeal, 47 Pa. 437 (1864); Walters's Estate, 197 Pa. 555 (1901). Where a will does not fix the amount or character of such maintenance, the Orphans' Court has jurisdiction and power to fix the amount and enforce the payment thereof: Craven v. Bleakney, 9 Watts, 19 (1839); Gibson's Appeal, 25 Pa. 191 (1855); Steele's Appeal, 47 Pa. 437 (1864); Walters's Estate, 197 Pa. 555 (1901); Fessenden's Estate, 170 Pa. 631 (1895); Phillips's Estate, 19 Pitts. L. J. (N. S.) 391 (1889); Clark's Estate, 25 Dist. R. 986 (1916). Such maintenance is a matter which admits of compensation in money, and the amount of the allowance must depend on all of the circumstances of the case, each case furnishing its own rule: Craven v. Bleakney, 9 Watts, 19 (1839); the sound discretion of the court to determine what shall be reasonable as to place, material and quantum. A comfortable maintenance, measured by the station, habits and tastes of the testator and the party to be maintained, is presumed; no more, no less; without extravagance either as to place or material; such being the only limitations: Steele's Appeal, 47 Pa. 437 (1864).

After a careful review of the entire record and due consideration of, and deliberation upon, all of the evidence adduced and the different aspects of the controversy, we are of the opinion that a fair and reasonable allowance for

2 D. & C.

O'Leary's Estate.

the maintenance and support of the petitioner, in his present physical condition and needs, would be (while circumstances exist as they presently are) $50 per month, and that the same should begin with April 1, 1922, and continue on, at that rate, until further order of this court; the petitioner and the respondent to have the privilege at any time to make application to this court to have such periodical allowance increased or decreased, if or whenever, changed circumstances or conditions shall justify. Furthermore, it being admitted that no payments have been made towards the petitioner's maintenance by the respondent or out of the decedent's estate for the thirteen months prior to April 1, 1922, and the estate and its assets being, as has hereinbefore been found, absolutely liable for such support, and the evidence indicating that payment at the old rate of $35 per month for such thirteen months' period would have been accepted by the petitioner without protest, had payment at such rate been promptly made, we are of the opinion that the petitioner is justly entitled to receive, and should accordingly here be further awarded, payment of such unpaid maintenance for the said thirteen months' period at the old rate, to wit, a total of $455. A decree in accordance with these conclusions immediately follows:

*Decree.*

And now, April 12, 1922, this matter came on to be heard on petition of John O'Leary for an order on Jennie S. O'Leary, executrix of the last will and testament of Gerald A. O'Leary, deceased, requiring the payment of sufficient funds for his support and maintenance in accordance with the provisions of the said will, and upon answer and replication filed and testimony taken, and thereupon the matter was argued; whereupon, upon due consideration thereof, it is ordered, adjudged and decreed that the respondent, as such executrix, forthwith pay to the petitioner, or his counsel of record, the sum of $455, in payment of unpaid maintenance of the petitioner up to and including March 31, 1922, and for his maintenance and support accruing on and after April 1, 1922, the sum of $50 per month, payable monthly, continuing to pay such monthly payments at the rate of $50 per month until further order of this court; the petitioner and the respondent being hereby given leave to make application for an increase in, or decrease of, such monthly allowance, if or whenever, conditions or circumstances surrounding the petitioner or the estate change or justify; and, furthermore, that the costs of this proceeding be paid by the executrix out of the assets of the decedent's estate.

From Harry D. Hamilton, Washington, Pa.